### The *inhabitants of* Parsonsfield *vs.* Dalton.

Where a town had become a congregational parish, by building a meeting house for that denomination, and settling a minister; and afterwards an act was passed incorporating certain individuals by name, with their families, having *B. R.* for their pastor, with their associates and such others as might afterwards associate with them, as the congregational society in the same town of *P ;*—it was held that this act did not create a new corporation, but only recognized and confirmed the rights of the parish already existing and entitled to the parish funds, and to the lands reserved for the use of the ministry in the town.

This was a writ of entry, in which the controversy regarded the title to certain lands in *Parsonsfield*, the tenant claiming them under the first or congregational parish or society, whose title he held ; and the demandants claiming them as belonging to the town.

It appeared that between the years 1785 and 1790, the town adopted various measures for building a meeting house ; and that in 1788 a deed was made by *John Brown*, conveying to a committee of the town four acres of land on which the meeting house was afterwards erected, and including the demanded premises, for the use of the town for parochial purposes. In 1790, the town voted that the meeting house should be the property of the congregational society ; that the taxes of fifteen persons called baptists, which were assessed for building the meeting house, should be abated ; and that one of the lots designated for the use of the ministry should be exchanged

with *John Brown*, for land and buildings near the meeting house. *Brown* accordingly executed another deed of a larger tract of land, including the land described in the former deed, to a committee of the town, for the use of the congregational society; which use the town ratified and approved. Various other arrangements were made by the town, for building the meeting house, the baptists being expressly exempted from taxation for that purpose, and for settling the Rev. *Benjamin Rolfe;* which was done in 1795, at the expense of the town, the baptists excepted. It appeared from other votes, up to the year 1801, that the expenses of erecting a house for Mr. *Rolfe,* paying his salary, and finishing the meeting house, were in the same manner assessed on the " congregational society," as it was termed at some times, and at others on " Mr. *Rolfe's* parishioners." In 1799, it was voted that the baptists should have their proportion of money arising from the sale of ministerial lands in the town; and in 1801, the " congregational society" having applied to the legislature for incorporation, the town voted to oppose the measure, " if it deprives the other societies of their right in the public lands in said town, given for the support of the ministry"; and at the same time also voted that the ministerial lands in the town should be equally divided " between the three societies." The town held its meetings in the meeting house, and placed a town pound, and a school house on the tract of four acres, which remained till 1801.

On the second day of *March* 1802, an act was passed incorporating thirty one persons by name, having Mr. *Rolfe* for their pastor, with their families and estates, and such other persons as had already associated or might afterwards associate themselves for that purpose, into a religious society, by the name of the congregational society in *Parsonsfield*, with the usual parochial corporate powers. At that time, and for several years previous, there were two other societies of baptists, in the same town, having their separate ministers and places of worship; but no other parish was organized under an act of incorporation.

Upon this evidence *Preble J.* before whom the cause was tried, instructed the jury that, for the purposes of this trial, they might consider the act of *March* 2, 1802, not as creating a new society, but

Parsonsfield *v.* Dalton.

as giving form and consistency and a corporate capacity to the congregational society already in existence, and known and recognized as such by the town. And a verdict was returned for the tenant, subject to the opinion of the court upon the correctness of those instructions.

*J. Shepley* argued for the demandants, and admitted that if the act of *March* 2, 1802, created no new corporation, but only defined and confirmed the powers of an existing parish, the property in controversy would belong to the society whose title the tenant holds. But he contended that the act created a new corporation, such as is called a poll-parish, having no territorial limits, but known only by the individuals belonging to it. *Jewett v. Burroughs* 15. *Mass.* 464. *Dillingham v. Snow* 5. *Mass.* 547. *Cochran v. Camden* 15. *Mass.* 296. *Minot v. Curtis* 7. *Mass.* 444. *Sutton v. Cole* 8. *Mass.* 96. 3. *Pick.* 232.

Previous to the passage of the act, no body of men could claim to control the property, against the will of the town. All the grants were made to the town, and by it was the property managed, and all business relating to it transacted. The majority of the inhabitants remained unaffected by the new act, which could not abridge their rights already vested; nor devolve on the new society any duties incumbent on the town or parish. *Shapleigh v. Gilman* 13. *Mass.* 190.

*N. Emery,* for the tenant, adverted to the different votes passed on this subject by the town, which, he said, showed a distinct appropriation of the land for the use of the congregational parish, or society, of which Mr. *Rolfe* was the pastor. This appropriation effected nothing more than the law itself would have done, and it ought to be held valid, if it can be, without violating existing rules. The special act created no new corporation. It was not limited to individuals by name; but included in its terms all who then were, or might afterwards become members of the congregational society, of which body, the act is nothing more than a legislative recognition, confirming its rights and privileges. *The Episcopal Char. Soc. v. The Episcopal Church in Dedham* 4. *Pick.* 372. *Medford v. Pratt ib.* 422.

MELLEN C. J. delivered the opinion of the Court at the ensuing term in *Cumberland*.

By the report, it appears to be admitted that the tenant has a good title to the premises demanded, if, upon the facts therein stated, the congregational society in the town of *Parsonsfield*, under which he claims, owned the same when the conveyance was made to him. The nature and merits of the title of that society, therefore, are the subjects of our consideration.

It appears that in 1788, one *John Brown* made and executed a deed of four acres of land to a committee of the town, embracing the demanded premises, for the use of the ministry; and in the year 1790 he made another deed of a larger tract of land, including what was conveyed by the former deed, to a committee of said town for the use of the congregational society; and that the town appropriated all the last named tract to the use of that society. A meeting house having been erected by the town on the lot, in *January* 1795, Mr. *Rolfe* was ordained as the minister of the congregational society, by the vote and under the authority of the town; and he continued in that office for some years after the act of incorporation was passed which is hereinafter mentioned. All the transactions in relation to the meeting house and the settlement and support of Mr. *Rolfe*, though of a parochial character, were conducted in the name of the town. In 1801 a committee was chosen to procure an act to incorporate the congregational society; and the act was passed *March* 2, 1802, which will presently be particularly examined. No other religious society appears to have been incorporated in the town; though there are, and for many years have been many baptists, who were generally excused from the payment of expenses incident to the erection and completion of the meeting house, and also of the salary of Mr. *Rolfe*. There is nothing unusual in the mode of proceeding which the town adopted respecting those concerns which were strictly parochial; as the court took occasion very distinctly to observe in the case of *Jewett v. Burroughs* which was cited by the counsel for the demandants. The facts in that case, as well as the argument of the court, as stated by the chief justice in delivering their opinion,

Parsonsfield *v.* Dalton.

seem to throw a strong light on the case before us. Before examining the act of incorporation of *March* 2, 1802, until which time it is apparent the whole town composed one parish, and, in respect to parochial affairs, acted as such, as we have before observed; it is to be distinctly remarked that such parish was called, in all the proceedings of the town, the "congregational society." The court observe in the above cited case of *Jewett v. Burroughs*, "if the town was a parish, it was a congregational parish; for the former minister, Mr. *Hasey*, was expressly settled as a congregational minister, and continued such until his death." The same observation seems equally applicable to the present case, *mutatis mutandis*.

Let us in the first place inquire and ascertain what was the congregational society, and what were its rights prior to the act of incorporation. The records of the town call the society over which Mr. *Rolfe* was ordained, the congregational society; and such it was in fact. For the use of this society the tract of land, of which the demanded premises are a part, was conveyed to the town; by means whereof such society became entitled to it. This is no new principle. In the grants of numerous townships lying in this State, lots have been reserved and afterwards drawn, for the use of the ministry, long before any congregational society was or could be formed; but when formed, the estate vested. In this state of things in *Parsonsfield*, it would seem that before the act of incorporation was passed, the estate was vested in the congregational society over which Mr. *Rolfe* was ordained; and that, unless for purposes of convenience and peace, the aid of the act was not a matter of importance. In the case of *Jewett v. Burroughs*, it appears that the town of *Lebanon* acted as such, in the concerns purely parochial; and that the congregational society, over which Mr. *Hasey* was settled, had never been incorporated as the congregational or first parish in the town; but being overpowered by a majority of those who had seceded and filed certificates, according to the statute of 1811, respecting religious freedom, they obtained a resolve authorizing a particular magistrate to call a meeting of the congregational society in *Lebanon*, for organizing the parish. After being thus organized, the parish proceeded to the ordination of Mr. *Burroughs* as their minister; and in that capacity he commenced

Parsonsfield *v*. Dalton.

the action to recover certain lands which had been drawn as ministerial lots; and the court sustained the action and rendered judgment in his favor. Suppose the same course had been pursued in *Parsonsfield ;* would any doubt exist as to the title of the congregational society to the lands in question?

This leads us to the examination of the incorporating act of *March* 2, 1802, and to see whether it has in any manner impaired that title. Certain persons are named in the act, thirty one in number, and it is declared that they " having for their pastor or teacher in religion, the Rev. *Benjamin Rolfe*, regularly settled in said town, a congregational minister, with their families and estates, together with such others as have already associated themselves or may hereafter associate themselves for the same purpose, in the manner herein prescribed, be and are hereby incorporated into a religious society, by the name of the congregational society in *Parsonsfield*, with all the powers, privileges and immunities, to which parishes in this Commonwealth are by law entitled." The language of this act is explicit, and shows that the religious society thereby incorporated is the same which was before known in the town as such, and for whose benefit the lands were conveyed by *Brown*, and whose interests and concerns had, for a series of years, been regulated by the town, though of a parochial character, according to the prevailing usage in such circumstances. It has been objected that the fourth section of the act, which declares, " that said congregational society be and hereby is invested with the right to and control over all the real estate heretofore granted, bargained, sold, exchanged, reserved, given or appropriated to the congregational society, or for the support or use of the congregational ministry in said town;—to be held and appropriated by said society for the sole use and benefit of the congregational ministry in said town forever ;"—is in its nature beyond the legitimate powers of legislation; but as we view this cause, the objection is not founded in fact, and of course the principle contended for is inapplicable.

We do not consider the fourth section as designed or as professing to take the property of one society and grant it to another ; but merely as declaring in a clear and explicit manner a principle which before existed. It declared that the society was thereby invested

Parsonsfield *v.* Dalton.

with the right to, and control over, the estate; but notwithstanding this phraseology, we do not consider it as making, or intending to make, any change of property or ownership  Every part of the act distinctly indicates that such was not the object in view.  It only authorized the congregational society to act in a parochial form; which they never had done; but which, according to the opinion of the court in *Jewett v. Burroughs*, they might legally have done, without an act of incorporation.  It authorized them to do what the resolve before mentioned authorized the congregational society in *Lebanon* to do.  In the present case, the act was not necessary to the perfection of the title of the congregational society, or those claiming under them, to the lands in question, and so it has not strengthened the title; neither can it be considered as having impaired or weakened it.  In this point of view, it is seen at once that the objection founded on the fact that the act created and incorporated a poll parish becomes of no importance.  It may be further observed, in support of the construction given to the act in question, that the second section provided that any inhabitant of the town might, at any time become a member of the congregational society, by filing with the clerk of the society a certificate of his wishes and intentions.  This shews that it was not intended as granting exclusive rights and privileges, but as leaving those rights and privileges unaffected, in respect to property, as well as conscience.

We have carefully examined the other cases, cited by the counsel for the demandants, but we cannot perceive that that they have any particular application to this cause, or that they were decided on principles which can properly have any influence, in the view we have taken of it.

With respect to the act incorporating the first congregational society in *Sutton*, it is different from the act in question in this case. Only a certain number of the inhabitants of *Sutton* were incorporated as a society, whose names are all stated in the act, but none others are made members; whereas the act before us incorporates not only those inhabitants of *Parsonsfield* who are named, but all who had before the date of the act associated themselves with them for the purposes in view.  It was not exclusive as in the case of

*Sutton,* but so comprehensive as to be completely identified with the pre-existing congregational society.

We are all of opinion that the instructions to the jury were correct, and that there must be        *Judgment on the verdict.*