THE WARDENS AND VESTRYMEN OF CHRIST CHURCH vs. THE MAYOR AND ALDERMEN OF SAVANNAH.

1. The title to the cemetery connected with the parish church in Savannah, called "Christ Church," was vested, by the provincial act of 1758, in the rector of said church as a corporation.
2. After the Revolution, ecclesiastical property held by the rector for pious uses devolved upon the church or society constituting the local body of Christians then and now known as "Christ Church," and all such property not expressly withdrawn by the State, passed to the corporation created by the act of 1789, this corporation being "The Church Wardens and Vestrymen of the Episcopal Church in Savannah called Christ Church."

April 8, 1889.

Title. Estates. Corporations. Before Judge ADAMS. Chatham superior court. December term, 1887.

A bill was filed by The Church Wardens and Vestrymen of the Episcopal Church in Savannah called Christ Church, against The Mayor and Aldermen of the City of Savannah, to enjoin the threatened removal by defendant of a wall around the cemetery on the southeast corner of South Broad and Abercorn streets in Savannah, the title to which is claimed by complain-

---

ant, and also the threatened diversion of a strip of the property for widening Abercorn street. The defendant, by its answer, took issue, denying the claim set up by complainant and asserting title in itself. The case was heard upon a motion for permanent injunction, and after the introduction of evidence (which is reported in the decision), the court dismissed the bill; and complainant excepted.

R. FALLIGANT and W. G. CHARLTON, for plaintiff.

J. R. SAUSSY and S. B. ADAMS, for defendant.

BLECKLEY, Chief Justice.

In December, 1789, certain persons, of whom the plaintiffs are the successors, were incorporated by an act of the General Assembly, by the name and style of "The Church Wardens and Vestrymen of the Episcopal Church in Savannah called Christ Church." Marb. & Crawf. Dig. 144. The preamble to the act recites that it is necessary for the promotion of religion and virtue that churches and religious societies be made capable of holding, enjoying and defending any property that they may have, or may acquire by gifts, grants or otherwise, and that Christ Church in Savannah has long since been established. The act proceeds to invest the corporation which it creates with all manner of property, both real and personal, donations, gifts, grants, hereditaments, privileges and immunities whatever, which may belong to the said church, to have and to hold the same for the proper use, benefit and behoof of the said church. The question in this case being whether this corporation acquired title to the cemetery in controversy, the first step to be taken is to ascertain whether that cemetery was at the date of this act of

v 82-42

incorporation the property of Christ Church. This carries us back to the provincial act, passed 15th March, 1758, (Colonial Acts, p. 19,) which divided the province into parishes and established religious worship therein according to the rites and ceremonies of the Church of England. The territorial division made was into eight parishes, the first of which embraced the town and district of Savannah, extending up the river Savannah, including the islands therein as far as the southeast boundary of Goshen, from thence southwest to the river Great Ogeechee, and from the town of Savannah eastward to the mouth of the river Savannah, including the sea islands to the mouth of the river Great Ogeechee, and all the settlements on the north side of said river, to the western boundaries thereof. The name given to this parish was Christ Church. The second section of the act declared that the church already erected in the town of Savannah, and the ground as then used as a cemetery or burial place thereto, should be the parish church and cemetery of Christ Church. The third section declared that the clerk, then present minister of Savannah (Bartholomew Zouberbuhler by name) should be the rector and incumbent of said church; and that he was thereby incorporated and made a body politic and corporate by the name of the Rector of Christ Church in the town of Savannah; was enabled to sue and be sued by such name, was declared to have the cure of souls within the parish, and that he should be in the actual possession of the church, with its cemetery and appurtenances, to hold and enjoy the same to him and his successors, together with the glebe land already granted to him, and the messuage or tenement near to the said church, with all and singular the buildings and appurtenances thereunto belonging, and also all such other lands, tenements and heredita-

ments as should or might thereafter be given and granted to the said church or the incumbent thereof.

A subsequent act, of April, 1763, (Colonial Acts, pp. 197–8,) reciting that the cemetery in the parish of Christ Church belonging to the said parish had become too small for the occasion, directed that the cemetery be enlarged and extended to the line of Abercorn street to the westward, and one hundred feet to the southward ; the whole to contain two hundred and ten feet square ; and the church wardens and vestrymen of the parish were empowered at their discretion to agree with and hire workmen to complete, enclose and finish the same. Another act, passed April 11th, 1768, (*Ibid.* 433,) reciting that the cemetery or public burial ground for the parish of Christ Church, notwithstanding the previous addition, was apparently too small to answer the purposes intended, authorized the church wardens and vestry to lay out an addition of one hundred and seventy feet in length, of and from the common of the town of Savannah, and adjoining the cemetery or public burial ground, to the eastward; and that the addition so laid out should from thenceforth forever be and remain as part and parcel of the said cemetery or public burial ground; and the wardens and vestry were empowered to enclose the same accordingly at their discretion. Both these additions were made, as we may assume from the record and from the argument of counsel in the present case. A still further addition was made, under an ordinance of the municipal council of Savannah, in 1789, during the same year that the corporation of the plaintiffs in error was created, and some months before that creation ; but as this last addition is not now in controversy, we need not further notice it for the present.

1. We can have no doubt that the original cemetery,

with the two enlargements made by the provincial legislature, was church property, and vested in the spiritual corporation, consisting of the incumbent of the parish, constituted by the act of 1758. That act must be understood as it was intended by the provincial legislature. It has the same meaning for us in 1889 as it had for the courts of the province or for those of Westminster Hall in 1758. We must construe it now precisely as those courts would have construed it then had it come up before them for construction. They certainly would have held it as meaning to fix the title to all the enumerated property, including the cemetery, in the corporation which it created. Those courts would have had no difficulty in accounting for the words " shall be in the actual possession of the said church, with its cemetery and appurtenances, and shall hold and enjoy the same to him and his successors." They would have construed them as a statutory investiture of the temporal part of the benefice as the same was constituted or declared by the act of incorporation.

The method of induction at common law, and the effect of it, are stated by Blackstone, 1 Commentaries, 391, thus: " Induction is performed by a mandate from the bishop to the archdeacon, who usually issues out a precept to other clergymen to perform it for him. It is done by giving the clerk corporal possession of the church, as by holding the ring of the door, tolling a bell, or the like; and is a form required by law, with intent to give all the parishioners due notice, and sufficient certainty of their new minister, to whom their tithes are to be paid. This therefore is the investiture of the temporal part of the benefice, as institution is of the spiritual. And when a clerk is thus presented, instituted and inducted into a rectory, he is then, and not before, in full and complete possession, and is called in law *persona impersonata*, or parson imparsonee."

If it were true that the cemetery of a parish church would not pass to the parson and his successors by induction thus performed, it might be said that statutory investiture, such as we are considering, was broader and comprehended more than the induction of the common law. We find it impossible to read the act of incorporation from the standpoint of those who passed it, and of the time in which it was passed, without regarding it as taking effect upon the title to the cemetery in precisely the same manner as upon the title to the church. The possession, holding and enjoyment of both are provided for by identically the same language. And looking in the same way to the acts of 1763 and 1768 providing for the enlargement of the cemetery, we feel sure that they were intended to bring the additions into exactly the same relation to the corporate body, with respect to title, as that borne by the original cemetery. The later of these acts expressly declared that the addition which it provided for should " thenceforth forever be and remain as part and parcel of the said cemetery." Thus the cemetery was mentioned as one, notwithstanding a previous addition had been made, and the contemplated further addition was to be and remain as part and parcel of the whole. That this latter act described the cemetery as the " public burial ground for the parish of Christ Church," does not militate against the view which we have expressed touching title, as it respects either the original cemetery or the additions made thereto. No doubt, under the system then prevailing, the cemetery of a parish church was always the public burial ground for the parish. There is no reason of which we are aware to think otherwise. We see not how this would operate to hinder the spiritual corporation from holding the title and having such legal property in the cemetery as would be consistent

with its use as the public burial ground for the parish. There would be no obstacle at the present day any more than there was then, to constituting a religious body the owner of a burial ground in which all the inhabitants of a given district might have a right to be interred. There is no incompatibility between corporate ownership and such use, and no legal necessity for uniting title and use for burial in the same person or persons. To whom does a given cemetery belong, is a very different question from that, for whose sepulture is it intended. For an act (approved December 19, 1818,) vesting the fee simple of the cemetery or burial ground in the city of Augusta, in the trustees of the Protestant Episcopal church of that city, see Lamar's Dig. 848, 849. It is not improbable that this cemetery is the same spoken of in the fourth section of the act of 1758 (above cited) for dividing the province into parishes, and which was then appurtenant to the parish church of Saint Paul, the rector of which church was incorporated by the fourth, as was the rector of Christ Church by the third section of that statute.

2. Having, as we conceive, by a right and proper construction of the original act of incorporation, ascertained that the cemetery now in question belonged to the corporate body known by the name of "the rector of Christ Church in the town of Savannah," what became of that corporation and its effects when regal government ceased to exist in Georgia, and the province became a sovereign State ? These questions open a wide field for research, both legal and historical, a field into which we have entered only far enough to satisfy our own minds that whatever may have become of the corporation, its property of all kinds was still property appertaining to the church; and if subject to seizure and appropriation by the State, (which, from the authori-

ties, admits of question,) no such seizure or appropriation of this cemetery has ever been made by the State of Georgia. On the contrary, we find that by the act of 1789, creating the new corporation, Christ Church in Savannah was recognized as having been long since established, and we have no doubt that this refers to the same religious society and spiritual body of Christians which had from the beginning, and continuously thereafter, constituted the parish church of the same name in Savannah. According to the preamble it was desirable that churches and religious societies be made capable of holding, enjoying and defending any property that they may have or may acquire. The State, so far from intending to take away from Christ Church any church site, church edifice or cemetery which had ever belonged to it, either in its corporate or social capacity, that is, as a spiritual corporation by virtue of the act of 1758, or as a mere religious society, designed to confer on it corporate capacity for holding, enjoying and defending all its property, no matter when or how acquired.

It is said a distinction is to be taken between property derived from the government by public grant or by the exercise of the power of taxation, and property donated to the church by individuals or purchased with its own money; but we find no very clear warrant for this distinction, either in decided cases on the subject elsewhere, or in the conduct of the State toward ecclesiastical bodies which the province fostered prior to the Revolution as part of a religious establishment. Whatever may have been the power of the State to reclaim grants and the proceeds of provincial taxes, it has forborne to exercise the power by any general law. No such law has come down to us. A few local and special acts touching glebe lands are to be found. See Mar. &

Crawf. Dig. 160, 161; Clayton's Dig. 64, 479.   There is every probability that the great bulk of glebe lands was disposed of under the name of "commons," "vacant lands," etc. etc., by virtue of various local acts passed from time to time during the first twenty or thirty years after the Revolution.   In investigating the subject for the present case, we have had the assistance of the able and eminent historian of Georgia, Charles C. Jones, Jr., LL. D., and the information which we have derived from him has contributed materially to the establishment of this conclusion.   But no instance has been brought to our knowledge in which the State has by legislation ever resumed as public property any church site, church edifice or cemetery which belonged before the Revolution to any local church or body of Christians, whether of the established religion or of dissenters therefrom.   We think that the grant, to new corporations of the Episcopalian denomination, of property which formerly belonged to local bodies of the established church, is to be regarded less as an assertion of title in the State to such property than as a recognition of continuous ownership in such local bodies, the new corporations being, as a general rule, created at church request and for church benefit.   To go for an example no further than the present case, we find from the record that the same persons who were incorporated by the act of 1789 as "The Church Wardens and Vestrymen of the Episcopal Church in Savannah called Christ Church," were the identical persons who had previously to the act of incorporation been elected by the parishioners of that church to the official positions which the act recognizes them as filling.   In other words, they were not made wardens and vestrymen by the legislature, but by the church.   And it appears from the record that before their incorporation, but the same year, they

were recoguized by the municipal government of Savan-
nah, by means of official correspondence, as having some
connection with the cemetery as it then existed.    There
is no accounting satisfactorily for this recognition but
upon the theory that up to that period, which was the
time when the city made an addition to the area of the
cemetery, the Christ Church of both ante and post-
revolutionary times was still regarded as the owner of
the cemetery.    No doubt this recognition was conform-
able to the fact and the law of the matter, for there is
no trace anywhere, so far as we know or can ascertain,
that the State ever resumed or sought to resume the
property in this cemetery.    It is certain there has
been no express grant of it by the State to the city of
Savannah.    If it be demanded how it passed from the
old rector and his successors in their corporate capacity,
and became the property of the church of which he and
they were the rectors down to the extinction of the cor-
poration by the repudiation of the church as a govern-
ment establishment, the answer is that the incorporated
rector held it in trust, and when the trustee became no
more, the title devolved informally but substantially
upon the church, the *cestui que trust*, until by the subse-
quent act of 1789, the legislature supplied a new trustee
by incorporating the wardens and vestrymen.    As to
succession in a subsequent corporation, see Milton *vs.*
Milton, 10 Pick. 447; Episcopal Society *vs.* Episcopal
Church, 1 *Ib.* 372; Parsonfield *vs.* Dalton, 5 Me. 217.
Grants for pious uses : Pawlet *vs.* Clark, 9 Cranch, 292;
Brown *vs.* Porter, 10 Mass. 93; Beaty *vs.* Kurtz, 2 Peters,
566.    Parish and municipal uses distinguished : Rich-
ardson *vs.* Brown, 6 Me. 307.    Establishment, care and
control of burial grounds now a municipal rather than
a parochial duty: Larkin *vs.* Ames, 10 Cush. 218.

We are not aware that the question has ever arisen in

Georgia upon the power of the State to take to itself the property of the ante-revolutionary church. In Virginia the question was decided in the affirmative by a divided court. Turpin *vs.* Larkin, 6 Call, 113. Followed afterwards in Selden *vs.* Overseers of Loudon, 11 Leigh, 127. The deprivation of the clergy, however, went no further than the statute provided. Claughton *vs.* McNaughten, 2 Munf. 513. The Supreme Court of the United States, in Terrett *vs.* Taylor, 9 Cranch, 43, in a learned and elaborate opinion by Judge Story, held some of the Virginia legislation touching the subject unconstitutional. The same court, speaking by the same eminent judge, in Pawlett *vs.* Clark, *Ib.* 292, further developed the argument in discussing a statute of Vermont. A supplement to Terrett *vs.* Taylor, *supra,* will be found in Mason *vs.* Muncaster, 9 Wheat. 445. And see Story on the Con. §1385; Cooly Const. Lim. 275 and note. Inasmuch as there has been no attempt by the State to assert any title in its behalf to the cemetery now in controversy between the parties to the present litigation, we are not called upon to say whether the State could effectively have made such assertion or not. The court below erred, we think, in holding and deciding that the plaintiffs in error never had title to the cemetery, and in dismissing the bill chiefly on that ground, as appears from the opinion of the court in the record.

For the present we decide no other question in the case, but leave the doctrine of prescription and all other matters of defence to be dealt with anew on the rehearing.

Judgment reversed.